**FILED**

**November 9, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**In re B.H., R.H., and M.M.**

**Nos. 22-678 and 22-680** (Kanawha County 21-JA-188, 21-JA-189, and 21-JA-192)

**MEMORANDUM DECISION**

Petitioners Mother D.M. and Father Z.H. were adjudicated as abusive and neglectful parents to their children, B.H. and R.H.[1]  They were granted post-adjudication improvement periods, during which they participated in services offered by the Department of Health and Human Resources (DHHR), returned negative drug tests, visited the children, and obtained employment.  But at disposition, the circuit court terminated Petitioners' parental rights, based largely on its conclusion that they had not attended their children's medical and therapeutic appointments during their improvement periods.  Petitioners now appeal the termination of their parental rights under West Virginia Code § 49-4-604(c)(6), contending that they corrected the conditions giving rise to the filing of the abuse and neglect petition against them.[2]

Upon review, we find that the termination of their parental rights on the bases offered by the circuit court was infirm.  Accordingly, we vacate the circuit court's order terminating parental rights and remand for further proceedings.  This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure for disposition in a memorandum decision.

DHHR alleged that it first became involved with Petitioners' family at least three months before April 2021 to implement a safety plan and provide services after receiving a referral from medical providers that B.H. was diagnosed with failure to thrive. Petitioners, according to DHHR, were later noncompliant with those services and ignored medical advice to wake infant B.H. during the night for feedings.  Petitioner Mother presented for a visit with a CPS worker with

---

[1] We use initials to identify the parties in abuse and neglect cases. *See* W. Va. R. App. Proc. 40(e).  M.M., who was in a legal guardianship prior to the institution of the proceedings below, is not referenced in the disposition order.  She is included in the style of the case, but the docket sheet reflects that M.M. was dismissed from the proceedings prior to the notice of appeal to this Court. The Petition also included child B.C., but this child was dismissed from the proceedings at the preliminary hearing because the child had been previously adopted.  So, this decision relates only to B.H. and R.H.

[2] Petitioner Mother appears by counsel Sandra K. Bullman.  Petitioner Father appears by counsel Adam Campbell.  DHHR appears by counsel Attorney General Patrick Morrisey and Assistant Attorney General Andrew T. Waight.  Benjamin Freeman serves as the children's guardian ad litem.

sores and lesions consistent with drug use, and had tested positive for THC and methamphetamine while pregnant with infant B.H. When Petitioner Mother failed to open the door for service providers for a week, DHHR sought emergency custody of the children and filed the underlying petition in April 2021, contending that Petitioners were not sufficiently motivated or organized to provide for the needs of the children on ongoing basis. As to Petitioner Father, specifically, DHHR alleged that he was rarely present in the home.

At adjudication, Petitioner Mother stipulated to "drug use impairing ability to parent" while Petitioner Father stipulated to "failure to adequately supervise the child[] and [the child's] care." The circuit court determined that the children were both abused and neglected children,[3] adjudicated Petitioners as abusive and neglectful parents according to their respective stipulations, and granted both Petitioners improvement periods. DHHR was ordered to provide parenting classes and adult life skills as well as provide Petitioners bus passes. Petitioners were to submit to a psychological evaluation, participate in random drug screenings, and, after three clean screens, could have supervised visitation with the children.

DHHR reported to the circuit court that Petitioners had rescheduled their psychological exams, and though they were passing drug screens, they were making slow progress bonding with and feeding their children during their supervised visitations. Still, DHHR recommended that Petitioners' improvement periods continue, and the circuit court entered an order continuing the improvement periods for further review. At a November 30, 2021 status hearing, Petitioner Mother requested that she and Petitioner Father be permitted to participate in the children's Birth to Three services and other medical appointments necessary to treat the children's numerous developmental delays and medical conditions. The court orally granted Petitioner Mother's request. Despite Petitioner Mother's apparent interest in the children's progress, the guardian ad litem (GAL) stated that she planned to recommend termination of Petitioners' parental rights; in her view, Petitioners were incapable of maintaining the children's schedule of medical and therapeutic appointments.

At the next hearing on January 24, 2022, the circuit court noted that an order had not been entered memorializing its rulings during the November hearing—meaning that Petitioners lacked the appropriate documentation to submit to healthcare providers to enable them to attend the children's appointments, which was especially necessary in light of COVID-19 restrictions. To facilitate Petitioners' participation in B.H. and R.H.'s medical and therapy appointments, the court ordered DHHR to bring Petitioners in remotely to the children's Birth to Three appointments. The court further ordered that the family services worker provide the dates and times of the children's medical appointments to Petitioners. Finally, the court ordered that both the foster parents and Petitioners should be permitted to attend medical appointments, despite COVID-19 restrictions. The court then set the matter for a dispositional hearing three months later.

---

[3] Although the parties have not raised this issue on appeal, we note that the terms abuse and neglect are not interchangeable under W. Va. Code § 49-1-201 (2020).

Before the April dispositional hearing, DHHR issued a court summary recounting that during a multi-disciplinary team (MDT) meeting, Petitioners stated that they attended all visitation and Birth to Three appointments when, in fact, they had missed several appointments without an excuse. In the summary, DHHR further explained that Petitioners claimed transportation issues had prevented them from attending some appointments. Petitioner Father's counsel pointed out that Vance Family Services was responsible for providing transportation and was not providing it, but DHHR noted that the transportation issue had not previously been raised.[4]

The circuit court conducted a dispositional hearing on April 19, 2022. Patrick Breeden, DHHR case manager for the family, testified that Petitioners had attended the children's medical appointments in the month preceding the hearing. Yet, despite his instructions to providers to allow Petitioners to participate in the appointments, the providers permitted only one—usually Petitioner Mother—to "go back." Mr. Breeden stated that "both the mother and father are not there [with the child] at the same time, but it's—that part is not their fault."

Mr. Breeden also testified that Petitioners had missed two or three visitation appointments in March. He explained that the children have two different services through Birth to Three—child development and nutrition—but he could not say for certain whether Petitioners knew about the nutrition services. When questioned about whether Petitioners had fully participated in services, he testified that he had yet to hear anything back from the family services provider. Finally, he testified that DHHR would recommend termination based on Petitioners' lack of progress in this case. At the end of Mr. Breeden's testimony, the court continued the dispositional hearing to May 3, 2022.

On May 3, 2022, DHHR called Bonnie Swan, the CPS worker for the family from June of 2020 to September of 2021, as a witness.[5] She testified as to the children's condition at the time of removal and steady progress with their foster family. She further testified that she had recommended termination of Petitioners' parental rights at one point in the improvement period because Petitioners missed their psychological evaluations and had issues with transportation. But, Ms. Swan admitted that she reconsidered that recommendation in July 2021 because Petitioners had regularly visited B.H. and R.H. unless work precluded them and continued to participate in services and parenting classes.

---

[4] At oral argument, Petitioner Father's counsel stated that Petitioners were not even aware transportation services had been set up. The record is unclear whether these services were available to Petitioners.

[5] Before Ms. Swan's testimony, Courtney Baumwell, an independent contractor from Birth to Three testified as to B.H.'s special needs and the progress the child made through Birth to Three.

Makaylah Keith of Children's Home Society testified that at the time of foster placement R.H. spoke two words at most. She explained that B.H. had positional plagiocephaly[6] and torticollis,[7] and that the child could not hold his head up or sit independently. She also testified that quickly after moving into the foster home, R.H. was able to hold conversation and B.H. had gained weight and made improvements.

Finally, DHHR called the foster mother, S.T., to testify. S.T. detailed the children's medical conditions, which required multiple occupational therapy and specialist medical appointments each week.[8] S.T. estimated that altogether the children have three to five therapy appointments a week. As for medical appointments, S.T. testified that both children need to see specialists due to B.H.'s congenital disorder of the toes, R.H.'s seasonal and chemical allergies, R.H.'s chronic ear infections, and B.H.'s flattened skull.

S.T. also testified that she started sending a weekly schedule of these appointments to Petitioner Mother but not Petitioner Father after the hearing on January 24, 2022. S.T. testified that between January and April 2022, Petitioner Mother had attended eleven of forty-one Birth to Three appointments and Petitioner Father had attended three. S.T. testified that Petitioners attended only two of eight medical appointments over those four months. S.T. later testified that these appointments did not include the appointments scheduled during the three weeks before the hearing which, mother did attend. The court continued the hearing following S.T.'s testimony.

When the dispositional hearing recommenced on June 28, 2022, Petitioner Mother testified that Petitioners do not currently have any drug problems and remained drug free throughout the proceedings. She also testified that she was not notified of medical appointments following the May 2022 hearing, and that Vance Family Services did not allow her to visit the children following the previous hearing because she was "out of units."[9] Petitioner Mother claimed that although she reached out to DHHR to resolve the issue, nothing was done about it.

---

[6] Positional plagiocephaly is a flattened spot on the side of an infant's head.

[7] Torticollis is a condition causing a shortening of the muscles on one side of an infant's neck.

[8] As to services, she testified that B.H. has low muscle tone on the left side of the body causing issues with eating, requiring occupational therapy. B.H.'s tongue does not sweep food properly out of the cheek, creating a choking hazard, and B.H. also has torticollis causing his neck to turn to one side. She testified that R.H. receives occupational therapy for help with coordination to use utensils.

[9] It is not clear from the briefs or the record exactly what the term "out of units" refers to in this case.

4

In response to whether she could ensure the children's attendance at Birth to Three appointments, Petitioner Mother pointed out that the appointments could be scheduled in her home just like they had been for the foster parents. She also explained that although she did not have a driver's license, she owned a car that Petitioner Father could drive in order to attend medical appointments. Finally, she testified that she was employed and had set up her home to accommodate the children once they were returned to her custody.

Petitioner Father testified that he had been compliant with all drug screens and services. He also affirmed that based on what he learned in services, he was capable of independently caring for the children. Finally, he explained that he was employed and that Petitioners' home was set up and ready for the children to be returned to their custody.

In a subsequent order, the circuit court found that B.H. and R.H. suffered from ongoing medical issues stemming from Petitioners' neglect and that their conditions had improved upon placement with the foster parents. The circuit court primarily focused on the medical appointments, finding that Petitioners were not only "permitted to be present at therapy and medical appointments beginning in May of 2021," but also, that they were "directed by the court and providers that participation in these medical appointments and therapies [was] important to demonstrate they are able to correct the problems which led to the filing of the original petition."

But, the circuit court found, Petitioners only minimally participated in the therapy and medical appointments. In reaching that conclusion, the court found that in January 2022, Petitioners were "again directed" to attend these appointments. Still, according to the court, "between January 24, 2022, and April 7, 2022, there were 41 Birth to Three appointments, [Petitioner Mother] attended eleven (11); Petitioner Father attended three (3)." And, "[b]etween January 24, 2022, and April 7, 2022, there were eight (8) in-person doctor appointments for the children, [and Petitioners] attended two." The court also found that Petitioner Mother admitted to lying about the number of appointments attended during the MDT and that Petitioner Mother did not have a valid driver's license despite the multiple appointments to which both children need to be transported to each week. And, according to the court, during the improvement period, both Petitioners demonstrated a "total lack of insight" into the children's medical needs and did not substantially participate in the children's medical appointments.

Based on those factual findings the circuit court concluded that during the improvement period, Petitioners had failed to correct the conditions of neglect that existed at the time of filing the petition, that the welfare of B.H and R.H. would be seriously threatened if returned to the custody of Petitioners, and that there was no reasonable likelihood that the conditions of neglect could be substantially corrected in the near future. In its order on July 26, 2022, the court terminated the parental rights of Petitioners to the children under West Virginia Code § 49-4-604(c)(6). Petitioners appeal from that order.

We review the final order and ultimate disposition in appeal from an abuse and neglect case under an abuse of discretion standard, but factual findings are reviewed under a clearly

5

erroneous standard.[10]  We exercise appropriate caution in reviewing whether factual findings are clearly erroneous:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether the child is abused or neglected.  These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[11]

Petitioners argue on appeal that the circuit court erred in terminating their parental rights because they successfully completed their improvement periods and because the  court relied on erroneous findings of fact relative to the medical appointments.  Specifically, Petitioner Mother argues that it  erred in giving "great weight to the fact that the parents did not attend the children's doctor appointments throughout their improvement period" when Petitioners "were not allowed to attend the appointments until November 2021, and the DHHR admits that they were not able to set up the appointments for [Petitioners'] attendance until almost April of 2022."   Further, according to Petitioner Mother,

> [w]hile the dispositional order reflects that at the July 15, 2021, hearing [Petitioners] had not participated in medical appointments for the children, [Petitioners] were not allowed to attend the children's appointments at the time. The only appointment [Petitioners] had missed was their own psychological evaluation appointment which [Petitioners] caused to be rescheduled and attended in September 2021.

---

[10] Syl. Pt. 1, *In re S.W.*, 236 W. Va. 309, 779 S.E.2d 577 (2015).

[11] Syl. Pt. 1, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

DHHR argues that the circuit court properly terminated Petitioner Mother's parental rights because "[t]here was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future because [Petitioner Mother] failed to follow through with or respond to a reasonable family case plan." DHHR emphasizes the fact that she only attended eleven of the forty-one Birth to Three appointments and two of the eight medical appointments, demonstrating that "regardless of her participation in services, the children's welfare would be seriously threatened if the children were returned to her care." So, according to DHHR, termination of Petitioner Mother's parental rights was in the children's best interests.

DHHR further argues that a parent's participation in services is not the proper standard for disposition in abuse and neglect proceedings. Rather, DHHR relies upon our holding that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child."[12]

Similarly, Petitioner Father argues that the circuit court erred in terminating his parental rights because he fully participated in and benefited from services, maintained employment, and never missed or failed a drug screen throughout the proceedings. Also, Petitioner Father asserts that "while he missed some doctor and [B]irth to [T]hree appointments, said absence was due to his work schedule." Still, DHHR emphasizes Petitioners' failure to appear for Birth to Three therapies and medical appointments. DHHR further argues that termination was in the children's best interests because Petitioner Father "failed to respond to or follow through with a reasonable case plan." Finally, DHHR asserts that termination was proper because "[t]he children had improved significantly in their development and were benefiting from the stability offered by their foster parents. Accordingly, it was in the best interests of the children for the circuit court to terminate [Petitioner Father's] parental rights to children B.H. and R.H."

We agree that the circuit court's factual conclusions relative to the medical appointments are not supported by the record or implicate circumstances surrounding those medical appointments that require consideration by the circuit court before termination of parental rights may be appropriate. The record demonstrates that Petitioners were not permitted to attend medical appointments until at least January of 2022 and likely not until late March. The court ordered that Petitioners should be allowed to attend certain therapeutic and medical appointments in November 2021, yet no order was entered memorializing that ruling until January 25, 2022. Even the circuit court noted that it could not hold Petitioners responsible for failing to attend when there was no order permitting them to do so.

The record also shows that as recently as March 2022, medical providers were at best unclear on whether to allow Petitioners "to go back" for the children's appointments and, at worst, refused to do so. At the dispositional hearing on April 29, 2022, Mr. Breeden, the DHHR

---

[12] Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014).

7

caseworker, explained that in late March he "received a call from a doctor's office stating that [Petitioners] were there and the doctor's office asked [him] if they were supposed to be here and if they were allowed to. [He] expressed to them, yes, they were," but critically, "[a]nything before that [Mr. Breeden] could not say for certain whether [Petitioners] were there."

At the April 29th dispositional hearing, the foster mother, S.T., testified that "[s]ince January 24th up until April 7th at the MDT meeting there were 41 Birth to Three appointments and [Petitioner Mother] attended 11 and [Petitioner Father] attended 3." She further testified that there were "8 in-person doctor appointments during that time period" and that Petitioners attended two of them—an ENT appointment on March 25 for B.H. and an outpatient speech evaluation for R.H. on March 29. But, on cross examination, the foster mother admitted that in the three weeks leading up to the initial dispositional hearing, Petitioners had attended all in-person appointments. When asked if she had attended medical and therapeutic appointments with her children, Petitioner Mother explained that she attended appointments and even kept a log. But, she testified that she stopped receiving information for the appointments after the January dispositional hearing— meaning that she was unable to attend the appointments in the three weeks leading up to the final hearing.

Simply put, the circuit court premised its termination of parental rights on the repeated emphasis it put on the need for Petitioners to attend the children's medical appointments to correct the conditions of abuse and neglect, but the factual findings underlying that conclusion do not consider that Petitioners' permission to attend those appointments has been obfuscated throughout this case. As to Petitioner Father, we find that the evidence surrounding his attendance of the medical appointments was either inadequately or incorrectly considered by the circuit court in its dispositional order insofar as it held it against Petitioner Father that he failed to attend appointments that he was either (1) not made aware of; (2) not allowed to attend without written court order; or (3) not allowed to attend due to Covid-19 restrictions. We therefore conclude it is appropriate to vacate the order terminating Petitioner Father's parental rights and remand for a new dispositional hearing.

While those factual determinations are equally ill-founded or inadequately addressed with respect to Petitioner Mother, we further vacate the circuit court's order terminating her parental rights for the fatal flaw in the dispositional order that terminates her parental rights on a basis for which she was never adjudicated. Petitioner Mother stipulated to "drug use impairing ability to parent" which is decidedly different than Petitioner Father's stipulation to failing to supervise the children's care. Nowhere in the dispositional order is Petitioner Mother's drug use addressed except to note that as of a July 2021 hearing, Petitioner Mother's drug screens were negative. We have recognized that "disposition may not ensue absent an adjudication of abuse and/or neglect, [and] termination of parental rights may not be fundamentally premised on conditions of abuse and/or neglect upon which a parent has not been properly adjudicated."[13] And,

---

[13] *In re K.L.*, ___ W. Va. ___, 885 S.E.2d 595, 604 (2022).

[w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order.[14]

Because the circuit court's findings that support its termination of Petitioner Mother's parental rights are based on conditions for which Petitioner Mother was not adjudicated, we also vacate that dispositional order and remand for further proceedings consistent with this decision.

Vacated and Remanded.

ISSUED:

CONCURRED IN BY:

Chief Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn

CONCURRING AND WRITING SEPARATELY:

Justice John A. Hutchison

---

[14] Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 624, 558 S.E.2d 620, 623 (2001).

Hutchison, Justice, concurring:

I concur with the majority's decision in this case because the circuit court's disposition order failed to adequately address the conditions of abuse and neglect to which the parents stipulated, and which served as the basis for their adjudication. We insist on procedural integrity in abuse and neglect cases "to protect both the due process rights of the parents as well as the rights of the innocent children." *In re Edward B.*, 210 W. Va. 621, 632, 558 S.E.2d 620, 631 (2001). Therefore, where adequate findings have not been made to support the termination of parental rights such as in this case, our law demands that we vacate the circuit court's decision. *Id.* at 624, 558 S.E.2d at 623, syl. pt. 5.

While we remand this case for a new dispositional hearing, "'the welfare of the child[ren] remains the polar star by which the discretion of the court [must] be guided.' Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972)." Syl. Pt. 4, in part, *In re J.S.*, 233 W. Va. 394, 758 S.E.2d 747 (2014). Therefore, in determining the appropriate disposition,

> [t]he court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether *sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child[ren]*.

Syl. Pt. 6, in part, *In the Interest of Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991) (emphasis added).

Here, the petitioner mother contends that she overcame her substance abuse problem as evidenced by her clean drug screens, and both she and the petitioner father maintain that they successfully completed their improvement periods because they participated in the services provided by the DHHR and regularly attended their children's medical and therapy appointments once allowed. However, "[t]he question at the dispositional phase of a child abuse and neglect proceeding is not simply whether the parent has successfully completed his or her assigned tasks during the improvement period. Rather, the pivotal question is what disposition is consistent with the best interests of the child." *In re Frances J.A.S.*, 213 W. Va. 636, 646, 584 S.E.2d 492, 502 (2003). Critically, "we have recognized that it is possible for an individual to show compliance with specific aspects of the case plan while failing to improve . . . [the] overall attitude and approach to parenting." *In re B.H.*, 233 W. Va. 57, 65, 754 S.E.2d 743, 751 (2014) (additional quotations and citations omitted). Therefore, upon remand, the circuit court should not focus on how many appointments or classes the petitioners attended. And, while the petitioner mother's clean drug screens must be considered, it is the petitioners' attitude and approach to parenting that must be at the forefront when the circuit court determines the appropriate disposition. The children at issue here have significant medical needs that require a considerable amount of time and attention. Indeed, the record indicates that they have several medical and/or therapy appointments each week. "Although [the] parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996). As such,

upon remand, I urge the circuit court to give careful consideration to these precepts in determining the appropriate disposition for these children.

For the reasons set forth above, I concur with decision in this case.